UNITED STATES BANKRUPTCY COURT      **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------X
                                    :
In re:                              :   Chapter 11
                                    :   Case No. 02-16131 (SMB)
GRUMMAN OLSON INDUSTRIES, INC.,     :
                                    :
                    Debtor.         :
                                    :
------------------------------------X
                                    :
OFFICIAL COMMITTEE OF UNSECURED     :
CREDITORS OF GRUMMAN OLSON          :   A.P. No. 04-4711
INDUSTRIES, INC.,                   :
                                    :
                    Plaintiff,      :
                                    :
        - against -                 :
                                    :
JAMES A. McCONNELL,                 :
H.I.G. CAPITAL LLC, and             :
SPECIALIZED VEHICLES CORPORATION,   :
                                    :
                    Defendants.     :
                                    :
------------------------------------X
```

## OPINION GRANTING IN PART AND DENYING IN PART
## MOTION TO DISMISS AND DENYING MOTION TO CHANGE VENUE

**A P P E A R A N C E S :**

HAHN & HESSEN, LLP
Attorneys for Official Committee of Unsecured
    Creditors of Grumman Olson Industries, Inc.
488 Madison Avenue
New York, New York 10022

    Mark T. Power, Esq.
        Of Counsel


SOMMER BARNARD ATTORNEYS, PC
Attorneys for James A. McConnell
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204

    Paul T. Deignan, Esq.
        Of Counsel

SCARCELLA ROSEN & SLOME, LLP
Attorneys for James A. McConnell
333 Earle Ovington Blvd., Suite 901
Uniondale, New York 11553

    Alan Marder, Esq.
        Of Counsel


BROWN RAYSMAN MILLSTEIN FELDER & STEINER, LLP
Attorneys for H.I.G. Capital, LLC and
    Specialized Vehicles Corporation, Inc.
900 Third Avenue
New York, New York 10022

    Bruce J. Zabarauskas, Esq.
        Of Counsel


KLUGER, PERETZ, KAPLAN & BERLIN, P.L.
Attorneys for H.I.G. Capital, LLC and
    Specialized Vehicles Corporation, Inc.
Miami Center, 17th Floor
Miami, Florida 33131

    Jason S. Oletsky, Esq.
        Of Counsel


**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge:**

The Official Committee of Unsecured Creditors (the "Committee") of Grumman Olson Industries, Inc. ("Grumman") commenced this adversary proceeding as the estate representative to recover damages arising in connection with an aborted purchase of Grumman's assets by H.I.G. Capital, LLC ("HIG") and Specialized Vehicles Corp. ("SVC," and together with HIG, "HIG/SVC"). The third defendant, James McConnell, was Grumman's former president and chief executive officer. The Committee's claims center on the

2

notion that HIG/SVC bribed McConnell to sell Grumman "on the cheap."

HIG/SVC have moved pursuant to FED. R. CIV. P. 12(b)(6) to dismiss the three claims – breach of fiduciary duty, aiding and abetting breach of fiduciary duty and tortious interference with contract – lodged against them in the Amended Complaint. McConnell has moved pursuant to 28 U.S.C. §§ 1406 and 1409 and FED. R. CIV. P. 12(b)(3) to dismiss the various avoidance and common law claims alleged against him based on improper venue, or alternatively, to transfer venue to the Western District of Michigan. For the reasons that follow, HIG/SVC's motion to dismiss the aiding and abetting and tortious interference claims is granted based upon the Committee's lack of standing, and the motions, including McConnell's venue motion, are otherwise denied.

## BACKGROUND

The background information for this portion of the decision is based on the allegations in the Plaintiff's Amended Adversary Proceeding Complaint ("Amended Complaint"), dated April 7, 2005, as well as certain documents referred to, relied on and sometimes quoted from by the Committee. These include an Employment Agreement, a Letter of Intent, and a Consulting Agreement discussed

3

below.[1]  The well-pleaded allegations are deemed to be true for the
purposes of HIG/SVC's motion to dismiss.[2]

## A.    Introduction

At all relevant times, Grumman was a manufacturer and designer
of truck bodies.   (Amended Complaint, ¶ 13.)   Grumman was
incorporated in New York, maintained its principal office in
Michigan, and conducted significant operations in Pennsylvania and
California.  (Id., ¶ 7.)  In addition, it owned a plant in Georgia
that it operated until September 2002.  (Id.)

Prior to 1997, Grumman was a wholly-owned subsidiary of
Northrop Grumman.  In December of that year, Olson Holdings, LLC
("Holdings"), an Indiana limited liability company, acquired 100%
of the common stock of Grumman through a management-led buyout.
(Id., ¶¶ 8, 14.)  The members of Holdings were the key senior

---

[1]      Copies of the three agreements are annexed to the Affirmation of Mark T. Power
in Opposition to Defendants Specialized Vehicles Corporation, Inc. and HIG Capital, LLC's
Motion to Dismiss, dated May 16, 2005 (ECF Doc. # 38.)

[2]      A court may dismiss a complaint under FED. R. CIV. P. 12(b)(6), made applicable
to this adversary proceeding by FED. R. BANKR. P. 7012, only if it appears beyond doubt that the
plaintiff would not be entitled to any type of relief, even if he proved the factual allegations in
his complaint.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Harsco Corp. v. Segui, 91 F.3d
337, 341 (2d Cir. 1996).  The court must assume the truth of the factual allegations in the
complaint, Harsco, 91 F.3d at 341, and draw all reasonable inferences in the plaintiff's favor.
Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  A court may also consider the contents of any
documents attached to the complaint, incorporated by reference, or relied on in drafting the
complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).  The Employment
Agreement, Letter of Intent and Consulting Agreement fall into this last category.

management of Grumman at the time of the buyout.  McConnell held a
55.3% membership interest in Holdings, and was the majority and
controlling member.  (<u>Id.</u>, ¶¶ 14, 16.)  Ten other members held the
remaining 44.7%.  (<u>See</u> <u>id.</u>, ¶ 14.)

Following the buyout, McConnell entered into an Executive
Stock Agreement, dated December 11, 1997 (the "Employment
Agreement") with Grumman, and became its president and chief
executive officer, as well as a director.  (<u>Id.</u>, ¶ 17.)  McConnell
bound himself to "devote his full time, attention, skill and
efforts to" Grumman's operations and not "engage in any other
business activity requiring any substantial amount of his time."
(<u>Employment Agreement</u>, Art. II; <u>Amended Complaint</u>, ¶ 18.)  In
addition, McConnell agreed to hold information relating to
Grumman's business including, <u>inter alia</u>, Grumman's financial
information, in strict confidence.  (<u>Employment Agreement</u>, Art.
VIII; <u>Amended Complaint</u>, ¶ 19.)  Grumman covenanted to pay
McConnell an annual salary of $189,375.  (<u>Employment Agreement</u>,
Art. III.)  In the event of a sale of Grumman and the termination
of McConnell's employment, he became entitled to receive a "golden
parachute," consisting of two years of full salary plus one
additional year's bonus.  (<u>Id.</u>, Art. V; <u>Amended Complaint</u>, ¶ 29.)

**B.   The Decision to Sell Grumman**

Grumman started to experience financial losses in 1999. (<u>Amended Complaint</u>, ¶ 20.) By the end of 2001, it faced significant liquidity problems, (<u>id.</u>, ¶ 21), and defaulted on a revolving credit facility with its secured lender. (<u>Id.</u>, ¶¶ 15, 21.) By early 2002, Grumman's board of directors decided that Grumman had to be sold. (<u>Id.</u>, ¶ 26.) Following this decision, McConnell, along with David Paritz, an advisor to the board, and Thomas Murphy, an accounting partner who was functioning as a <u>de facto</u> chief financial officer, approached various potential purchasers of Grumman's business. (<u>Id.</u>, ¶¶ 23, 27.) Upon information and belief, McConnell discussed the decision to sell with Transamerica Business Capital Corporation, Grumman's secured creditor, and Transamerica supplied McConnell with a list of potential buyers who McConnell thereafter contacted. (<u>Id.</u>, ¶ 28.)

McConnell realized that none of the members of Holdings, including himself, would recover their equity in the event of a sale. (<u>Id.</u>, ¶ 29.) Upon information and belief, McConnell also realized that he would not be able to collect his "golden parachute" if Grumman was forced to file a bankruptcy petition. (<u>Id.</u>) Upon information and belief, to ensure that he received comparable benefits, "McConnell embarked on a plan whereby he attempted to control the marketing and sales process of the Debtor in order to

6

extract a significant payment or other consideration for himself from a prospective suitor before he would agree to commit the Debtor to accept an offer from such suitor." (Id., ¶ 30.) Toward this end, and again on information and belief, McConnell elected to manage the sales process by himself, without the aid of a reputable investment banking firm, although he received "some assistance" from Murphy and Paritz. Upon information and belief, he avoided potential buyers, despite their strategic interest and financial ability to consummate a purchase, because he thought they would not offer him a separate side agreement. Finally, upon information and belief, McConnell advised interested parties that they had to compensate him personally to obtain his support for any agreement to sell Grumman. (Id., ¶ 31.)

During this time period, HIG/SVC became interested in acquiring Grumman.[3] (Id., ¶ 34.) Earlier, they had bought other companies at bankruptcy auctions, and as a result of the competitive bid process, were forced to bid more than their initial offers. (Id., ¶ 32-33.) Upon information and belief, HIG/SVC enlisted McConnell's support for a private sale of Grumman by offering to compensate him (the "Private Sale Premium") directly through a consulting arrangement even though they did not value and had little use for McConnell's

_____

[3]    SVC manufactures refrigerated truck and beverage delivery trucks; HIG is the equity sponsor and controlling shareholder of SVC. (Amended Complaint, ¶ 10.)

7

consulting services.  (<u>Id.</u>, ¶ 36.)

**C.    The September 2002 Agreements**

The Amended Complaint alleges a scheme through which HIG/SVC bought off McConnell and acquired complete domination and control over both sides of the deal.  First,[4] HIG signed a letter of intent with Grumman, dated September 17, 2002 (the "Letter of Intent"), to purchase Grumman's business.  (<u>Id.</u>, ¶ 37.)  McConnell signed the Letter of Intent on Grumman's behalf as its president and CEO. Grumman agreed, among other things, not to engage in transactions outside of the ordinary course of business without HIG/SVC's written consent, (<u>Letter of Intent</u>, § 4) and consented to a "no shop/no talk" clause – it would not solicit any other offers, entertain any unsolicited offers, negotiate with other potential buyers or respond to their inquiries.  (<u>Id.</u>, § 8.)  Afterwards, McConnell never solicited or pursued other options to sell Grumman's business. (<u>Amended Complaint</u>, ¶ 49.)

Second, on the same day, HIG/SVC and McConnell entered into side agreements (the "Side Agreements") that benefitted the parties at Grumman's expense.  (<u>Id.</u>, ¶ 38.)  McConnell agreed to assist and guide SVC's management "with respect to strategic decisions needed from time to time including in connection with, among other things,

_____

[4]    The recitation does not necessarily imply the order in which the events occurred.

8

the acquisition of [Grumman] currently being undertaken by [SVC]."
(<u>Consulting Agreement</u>, § 3.)  During the first 90 days, he promised
to devote up to 20 hours each week to the consulting services, and
thereafter, "to generally be available."  (<u>Id.</u>)  He was to work
under the supervision of SVC's board of directors.  (<u>Id.</u>, § 4.)

SVC undertook to pay McConnell an annual consulting fee of
$200,000, or a total of $400,000,  (<u>Id.</u>, § 6(a).)  In addition,
McConnell was eligible to receive an annual bonus of up to 50% of
the consulting fee, or potentially $200,000 over the life of the
Consulting Agreement.  (<u>Id.</u>, § 6(b).)  Furthermore, to the extent
that McConnell was not "otherwise" receiving certain benefits and
perquisites, SVC promised to provide medical insurance, an
automobile allowance of $1,200, country club dues up to $600 per
month and airport club membership fees up to $500 per month.  (<u>Id.</u>,
§ 6(c), (d).)  Finally, SVC granted McConnell the option to acquire
its common stock at less than fair market value.  Upon information
and belief, the option was worth somewhere between $325,000 and
$900,000.  (<u>Amended Complaint</u>, ¶ 39.)

The Side Agreements were a sham.  McConnell's consulting
services were of little, if any, value, and the payments were
designed to ensure that McConnell would not explore other options
to sell Grumman's assets at a higher price.  (<u>Id.</u>, ¶¶ 41, 48.)

9

Moreover, they diverted his attention from Grumman. Upon information and belief, he stopped devoting his full time to managing Grumman's business after September 17, 2002, and as a result, Grumman's financial performance continued to decline precipitously. (<u>Id.</u>, ¶ 46.) McConnell nevertheless continued to receive his full salary and benefits (in excess of $16,666 per month) from Grumman while HIG/SVC simultaneously paid him under the Consulting Agreement. (<u>Id.</u>, ¶ 47.)

Third, in September 2002, members of Holdings (other than Larry Martin and Al Freve) received the aggregate sum of $25,000 in exchange for granting HIG or its affiliate (i) a "call" option on their member units at a nominal exercise price, and (ii) an irrevocable proxy to vote their member units (the "Voting Proxy"). (<u>Id.</u>, ¶ 42.)

Fourth, all of the members of Grumman's board, except for McConnell, simultaneously resigned from the board, leaving McConnell as the sole remaining director of Grumman. (<u>Id.</u>, ¶ 43.)

McConnell conceded at his deposition that as a result of the Side Agreements and the Voting Proxy, the "continuing operations of the [Debtor's] board were . . . kind of set aside,' and HIG 'in essence, controlled the company' and was 'calling the shots.'"

10

(<u>Id.</u>, ¶ 44.)  After entering into the Side Agreements, McConnell abdicated his responsibilities, ceded control of Grumman to HIG/SVC, and became an employee of SVC.  (<u>Id.</u>, ¶¶ 45, 50.)

Because no independent person existed to protect Grumman's interests in the sale process, HIG directed McConnell to hire Alvarez & Marsal ("A&M"), a crisis management firm, to represent those interests.  The Amended Complaint implies, however, that this was window-dressing.  Upon information and belief, A&M was not independent because it was chosen by HIG, desired future referrals from HIG, and its success fee was payable by HIG/SVC and conditioned on closing the acquisition of Grumman by HIG/SVC.  (<u>Id.</u>, ¶ 50.) Furthermore, no independent fairness opinion was sought regarding the proposed transaction.  (<u>Id.</u>)

**D.   The Bankruptcy Case**

No sale had been consummated by the time Grumman filed this chapter 11 case on December 11, 2002.  Two days later, Grumman entered into an Asset Purchase Agreement with Olson Acquisition Corporation ("Olson"), which HIG had formed for the sole purpose of buying Grumman's assets.  (<u>Id.</u>, ¶ 51.)  The proposed sale was to be consummated through a chapter 11 plan, and would be subject to higher and better offers.  (<u>Id.</u>, ¶ 52.)

11

Grumman filed an amended plan on December 27, 2002, and following negotiations, the Committee and HIG reached an agreement in principle on the terms of a revised plan. (<u>Id.</u>, ¶ 53.) The revised plan eventually failed due primarily to Grumman's continuing financial deterioration. On February 27, 2003, Olson gave notice that it was terminating the Asset Purchase Agreement. (<u>Id.</u>, ¶¶ 53-54.) Grumman eventually sold its assets at a bankruptcy auction for a gross price of $18,500,000. (<u>Id.</u>, ¶ 57.) But for the defendants' actions, Grumman could have sold its assets before the petition date for $6 million more than it received through the auction. (<u>Id.</u>, ¶ 58.)

**E.    This Adversary Proceeding**

The Committee, acting as a representative of the estate, commenced this adversary proceeding on or about December 8, 2004, and filed the Amended Complaint on or about April 7, 2005. The Amended Complaint includes the following 12 claims for relief:

| Claim No. | Defendant | Nature of Claim (paragraphs) |
|---|---|---|
| 1 | McConnell | Avoid and recover an insider preference in the sum of $215,000 (¶¶ 60-65) |
| 2 | McConnell | Avoid and recover the private sale premium and salary and benefits while working for SVC as an intentional fraudulent transfer (¶¶ 67-68) |

| 3 | McConnell | Avoid and recover the private sale premium and salary and benefits while working for SVC as a constructive fraudulent transfer (¶¶ 70-73) |
| 4 | McConnell | Avoid and recover the private sale premium and salary and benefits while working for SVC as a constructive fraudulent transfer (¶¶ 75-77) |
| 5 | McConnell | Damages based on breach of fiduciary duty (¶¶ 79-82) |
| 6 | McConnell | Damages based on diversion of a corporate opportunity – the Private Sale Premium (¶¶ 84-86) |
| 7 | McConnell | An accounting and turnover pursuant to 11 U.S.C. § 543, based on diversion of a corporate opportunity – the Private Sale Premium (¶ 88) |
| 8 | HIG/SVC | Damages based on breach of fiduciary duty (¶¶ 90-94) |
| 9 | HIG/SVC | Damages based on aiding and abetting McConnell's breach of fiduciary duty (¶¶ 96-99) |
| 10 | McConnell | Damages based on breach of the Employment Agreement (¶¶ 101-05) |
| 11 | HIG/SVC | Damages based on the tortious interference with McConnell's Employment Agreement (¶¶ 107-12) |
| 12 | McConnell | Unjust enrichment (¶¶ 114-17) |

HIG/SVC has moved to dismiss the Eighth, Ninth and Eleventh Causes of Action on standing and pleading grounds. First, the Committee lacks standing under Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114 (2d Cir. 1991) to prosecute the claims. Second, the Amended Complaint fails to state claims for relief. Third, the allegations do not satisfy the specificity requirements

of Fed. R. Civ. P. 9(b).   Fourth, the Amended Complaint fails to
plead damages adequately.  McConnell has moved separately to dismiss
based upon improper venue, or alternatively, to transfer venue to
the Western District of Michigan.

**DISCUSSION**

**A.    HIG/SVC's Motion to Dismiss**

**1.    Standing**

HIG/SVC contends that the claims asserted by the Committee
belong to the creditors, and hence, cannot be asserted by or on
behalf of the estate.  State law determines whether the right to sue
belongs to the estate or its creditors.  Breeden v. Kirkpatrick &
Lockhart LLP (In re Bennett Funding Group, Inc.), 336 F.3d 94, 100
(2d Cir. 2003); Wight v. BankAmerica Corp., 219 F.3d 79, 86 (2d Cir.
2000); Mediators, Inc. v. Manney (In re Mediators, Inc.), 105 F.3d
822, 825 (2d Cir. 1997).  Grumman is a New York corporation with a
principal office in Michigan and significant operations in other
states.   HIG is a Delaware limited liability company with its
principal office in Florida.  (Amended Complaint, ¶ 10.)  SVC is a
Delaware corporation with its principal place of business in North
Carolina.  HIG/SVC invoked New York law in support of its argument
that  the  Committee  lacks  standing,  (Defendants  [HIG/SVC's]
Memorandum of Law in Support of Motion to Dismiss Amended Adversary
Proceeding  Complaint,  dated  May  2,  2005,  at  11)("HIG/SVC

14

Memorandum")(ECF Doc. # 30), and the Committee has apparently acquiesced in that selection. The Court will, therefore, treat New York as the governing law. Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000)(if both sides treat New York law as controlling in their memoranda, this is sufficient to establish New York as the governing law).

Under New York law, "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 120 (2d Cir. 1991); accord Bennett Funding, 336 F.3d at 100; Wight, 219 F.3d at 86; Mediators, 105 F.3d at 826. Cf. Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1093 (2d Cir. 1995)(applying Connecticut law). The so-called Wagoner Rule "derives from the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation." Wight, 219 F.3d at 86; Bennett Funding, 336 F.3d at 100. "Because management's misconduct is imputed to the corporation, and because a trustee stands in the shoes of the corporation, the Wagoner rule bars a trustee from suing to recover for a wrong that he himself essentially took part in." Wight, 219 F.3d at 87; Mediators, 105 F.3d at 826. Where the Committee sues in place of the trustee as the estate's representative, it is subject to the same limitation on standing.

15

See <u>Official Committee of Unsecured Creditors of Color Tile, Inc.</u>
<u>v. Coopers & Lybrand, LLP</u>, 322 F.3d 147, 156 (2d Cir. 2003);
<u>Mediators</u>, 105 F.3d at 825-26.[5]


### a.   The Aiding and Abetting Claim

HIG/SVC contend that the Committee lacks standing under the
<u>Wagoner</u> Rule to pursue the aiding and abetting claim asserted in the
Ninth Cause of Action.  I agree.  The gravamen of the Amended
Complaint is that HIG/SVC conspired with McConnell to sell Grumman
for less than it was worth.  To avoid an auction, HIG/SVC locked up
the deal through the Letter of Intent and paid the Private Sale
Premium, in the form of consulting fees and stock options, to
McConnell while he was still the debtor's president, CEO and sole

---

[5]     The parties treat the <u>Wagoner</u> Rule and the doctrine of <u>in pari delicto</u>
interchangeably, and the case law sometimes does too.  <u>See</u> <u>Color Tile</u>, 322 F.3d at 164 (stating
that the dismissals in <u>Mediators</u> and <u>Hirsch</u> were based on <u>in pari delicto</u>); <u>Goldin v. Primavera</u>
<u>Familienstiftung (In re Granite Partners, L.P.</u>), 194 B.R. 318, 329 (Bankr. S.D.N.Y. 1996).  The
two are not, however, the same.  The <u>Wagoner</u> Rule is one of standing.  <u>In pari delicto</u> is an
equitable defense analogous to unclean hands "rooted in the common-law notion that a plaintiff's
recovery may be barred by his own wrongful conduct."  <u>Pinter v. Dahl</u>, 486 U.S. 622, 632
(1988).  It is based on the idea that "where parties are equally at fault, the defending party is in
the stronger position."  <u>Ross v. Bolton</u>, 904 F.2d 819, 824 (2d Cir. 1990).  It is not enough that
both parties are at fault, or <u>in delicto</u> – they must be equally at fault, or <u>in pari delicto</u>.  <u>Color</u>
<u>Tile</u>, 322 F.3d at 163; <u>Ross</u>, 904 F.2d at 824.  The <u>Wagoner</u> Rule, on the other hand, deprives the
trustee of standing without regard to the relative degree of fault by the debtor's management or
the third party.

The <u>Wagoner</u> Rule can provide the basis to impute fault to the corporation for purposes
of <u>in pari delicto</u>.  But if the <u>Wagoner</u> Rule deprives the trustee of standing, a threshold issue, it
is unnecessary to consider whether it also supports the equitable defense of <u>in pari delicto</u>.  <u>See</u>
<u>In re CBI Holding Co.</u>, 311 B.R. 350, 367 (S.D.N.Y. 2004).

director.   McConnell breached his fiduciary duty to Grumman, the primary wrong, and began working for the benefit of HIG/SVC, whose interest in minimizing the sale price obviously diverged from Grumman's interest in maximizing it.  Although Grumman and HIG/SVC never consummated their transaction, the delay in marketing Grumman to other potential buyers while its financial condition deteriorated resulted in a lower selling price several months later.

As noted, agency law would ordinarily impute McConnell's misconduct to Grumman and the Committee.  As a result, even if HIG/SVC aided and abetted McConnell's breach of fiduciary duty and caused damage to Grumman, the _Wagoner_ Rule would prevent the Committee from suing on account of a wrong in which it is deemed to have participated.  The Committee nevertheless argues that the _Wagoner_ Rule does not bar the aiding and abetting claim because (1) HIG and SVC are insiders, (_Memorandum in Opposition to Defendants [HIG/SVC]'s Motion to Dismiss_, dated May 16, 2005 ("_Committee Opposition_"), at 13) (ECF Doc. # 37), (2) the allegations in the Amended Complaint establish that Grumman was a victim of the HIG/SVC's wrongful conduct, and not a primary wrongdoer, (_id._, at 14), (3) the "adverse interest" exception renders the _Wagoner_ Rule inapplicable, (_id._, at 15-18), and (4) it is inappropriate to dismiss under _Wagoner_ at the pleading stage.  (_Id._, at 18-19.)

17

Three of the four points can be rejected with brief comment. First, although the <u>Wagoner</u> Rule does not bar claims against corporate fiduciaries, <u>In re Mediators</u>, 105 F.3d at 826-27, a corporate insider cannot aid and abet another corporate insider. <u>Solow v. Stone</u>, 994 F. Supp. 173, 181 (S.D.N.Y.), <u>aff'd</u>, 163 F.3d 151 (2d Cir. 1998). "[A] third-party relationship between the aider and abettor and the corporation is a necessary element in any such action." <u>Id.</u> If all of the defendants were insiders, the aiding and abetting claim must fail.

Second, the <u>Wagoner</u> Rule bars the aiding and abetting claim even where the corporation is the victim of the insider's fraud. Initially, if the corporation did not suffer an injury, the trustee would not have any claim to assert, and the <u>Wagoner</u> Rule would be irrelevant. Thus, consideration of the <u>Wagoner</u> Rule assumes an injury to the corporation. More to the point, the <u>Wagoner</u> Rule was applied in <u>Mediators</u> where the debtor's sole shareholder transferred the debtor's art collection to himself at discounted prices with bank loans guaranteed by the debtor. See <u>Mediators</u>, 105 F.3d at 824.

Third, the <u>Wagoner</u> Rule was applied at the pleading stage to dismiss the complaints in <u>Hirsch</u> (affirming dismissal under FED. R. CIV. P. 12(b)(1)) and <u>Mediators</u> (affirming dismissal under FED. R.

18

CIV. P. 12(b)(6)).  Accord Wechsler v. Squadron, Ellenoff, Plesent
& Sheinfeld, L.L.P., 212 B.R. 34, 35 (S.D.N.Y. 1997)(dismissing
complaint under Wagoner rule pursuant to FED. R. CIV. P. 12(b)(1));
Granite Partners, 194 B.R. at 330-31 (denying injunctive relief
under Wagoner based on allegations in complaint).  Cf. Color Tile,
322 F.3d at 164 (affirming dismissal of complaint at pleading stage
based on in pari delicto).


     The Committee's invocation of the "adverse interest" exception
merits more explanation.  New York law will not impute the acts and
knowledge of the agent where the agent engages in a scheme to
defraud his principal on his own behalf or on behalf of another.
Wight, 219 F.3d at 87; Center v. Hampton Affiliates, Inc., 488
N.E.2d 828, 829 (N.Y. 1985).  The exception is, however, a narrow
one.  To come within it, the agent must totally abandon his
principal's interest and act entirely for his own or another's
benefit.  Mediators, 105 F.3d at 827.  The exception does not apply
simply because the agent has a conflict of interest or does not act
primarily for his principal.  Granite Partners, 194 B.R. at 331
n.15; Hampton Affiliates, Inc., 488 N.E.2d at 830.


     Even where the "adverse interest" exception would ordinarily
apply, there are additional limitations on its use.  First, it does
not apply if the wrongdoing agent is the corporation's sole

19

shareholder, Mediators, 105 F.3d at 827, or where all of the corporation's management participate in the wrongdoing. CBI Holdings, 311 B.R. at 373.   Under this "sole actor" rule, "the agent's knowledge [is imputed] to the principal notwithstanding the agent's self-dealing because the party that should have been informed was the agent itself albeit in its capacity as principal." Mediators, 105 F.3d at 827; accord In re Bennett Funding, 336 F.3d at 100.   Second, even if the wrongdoer is not a "sole actor," the adverse interest exception is still inapplicable unless there is at least one "innocent" decision maker among management or the shareholders who could have stopped the fraud. Bennett Funding, 336 F.3d at 101 (assuming the existence of the "innocent insider" exception without adopting it); CBI Holdings, 311 B.R. at 372-73 (rejecting the "innocent insider" exception but discussing its relationship to the Wagoner rule and the "sole actor" exception); Wechsler, 212 B.R. at 36 (dismissing the trustee's complaint for lack of standing based on the failure to allege the existence of an innocent member of debtor's management who could have been able to prevent the fraud had he known about it).

Here, the "adverse interest" exception does not apply for several reasons.   To start, the Committee does not allege that McConnell totally abandoned Grumman's interests.   To the contrary, the Grumman board had decided to sell the business, and McConnell

was fulfilling its prime directive.  Moreover, if the allegations

supported the "adverse interest" exception, its application would

nevertheless be barred by the "sole actor" rule.  The Committee

alleges that all of the Grumman directors other than McConnell

"abruptly" resigned "concurrently" with the execution of the Side

Agreements.  (<u>Amended Complaint</u>, ¶ 43.)  This left McConnell in sole

charge of Grumman.

Furthermore, the Amended Complaint does not allege that there

was an "innocent insider" that could have stopped McConnell's

misconduct.  As noted, the remaining members of the board resigned

"concurrently" with the execution of the Side Agreements.  In

addition, all but two of Holding's members sold their votes to

HIG/SVC. (<u>Id.</u>, ¶ 42.)  The Amended Complaint does not indicate that

the two dissenters – Larry Martin and Al Freve

– had any position with Grumman, or could have stopped McConnell.

Accordingly, the Court concludes that the Committee lacks

standing to assert the Ninth Cause of Action.

> **b.   Tortious Interference With Contract**

The Court reaches the same conclusion with respect to the

Eleventh Cause of Action.  The claim charges that HIG/SVC tortiously

interfered with the Employment Agreement.  After repeating and

21

realleging all of the prior allegations, (<u>Amended Complaint</u>, ¶ 106),
it avers that HIG and SVC had actual or constructive knowledge of
the Employment Agreement, (<u>id.</u>, ¶ 108), and that by inducing
McConnell to enter into the Side Agreements, HIG and SVC
intentionally interfered with the Employment Agreement. (<u>Id.</u>, ¶
109.)

These allegations are indistinguishable from the aiding and
abetting claim, and the two claims assert a "single form of
wrongdoing under different names." <u>Hirsch</u>, 72 F.3d at 1092
(internal quotation marks and citations omitted)(dismissing
accountant malpractice claim); <u>In re CBI Holding Co.</u>, 318 B.R. 761,
765-66 (S.D.N.Y. 2004)(dismissing accountant breach of contract and
negligence claims). In both instances, the Committee charges that
HIG/SVC "induced" McConnell to violate his duties to Grumman. The
aiding and abetting claim involves a breach of McConnell's fiduciary
duties while the tortious interference claim addresses the breach
of his contractual duties, but the duties are essentially the same.
Moreover, the underlying breaches are based, in each case, upon
McConnell's execution of the Side Agreements, and his misconduct in
connection with the management of the sale process. Accordingly,
the <u>Wagoner</u> Rule also deprives the plaintiff of standing to assert
the Eleventh Cause of Action.

## 2.    The Breach of Fiduciary Duty Claim

The remaining claim for relief against HIG/SVC, contained in the Eighth Cause of Action, asserts that on or about September 17, 2002, when Grumman was already insolvent or in the zone of insolvency, (see Amended Complaint, ¶ 90), HIG/SVC acquired and exercised control over Grumman, assumed the role of de facto director and became an insider with the attendant fiduciary duties. (Id., ¶ 91.)  HIG/SVC then breached its fiduciary duties by acting in its own self interest to the detriment of the debtor.  (Id., ¶ 92.)

As noted, the Wagoner Rule does not prevent an estate representative from suing a dishonest fiduciary. See Mediators, 105 F.3d at 826-27.  HIG/SVC also contends, however, that the Eighth Cause of Action (1) fails to state a claim for breach of fiduciary duty because it alleges "control" in a conclusory manner, (2) does not comply with FED. R. CIV. P. 9(b) and (3) does not adequately plead damages.

### a.    Introduction

Grumman is a New York corporation, and hence, the claim for breach of fiduciary duty is governed by New York law.  Walton v. Morgan Stanley & Co., 623 F.2d 796, 798 n.3 (2d Cir. 1980) ("New York law dictates that the law of the state of incorporation governs

23

an allegation of breach of fiduciary duty owed to a corporation.")
Under New York law, a claim for breach of fiduciary duty involves
three elements: (1) the existence of a fiduciary relationship, (2)
the breach of the fiduciary duty and (3) damages resulting from the
breach.  DDCLAB Ltd. v. E. I. DuPont de Nemours & Co., No. 03 Civ.
3654(GBD), 2005 WL 425495, at *8 (S.D.N.Y. Feb 18, 2005); Kidz Cloz,
Inc. v. Officially for Kids, Inc., No. 00 Civ. 6270(DC), 2002 WL
392291, at *4 (S.D.N.Y. Mar. 13, 2002); see Official Comm. of
Asbestos Claimants of G-I Holding, Inc. v. Heyman, 277 B.R. 20, 37
(S.D.N.Y. 2002).

A fiduciary duty relationship arises under New York law when
"one has reposed trust or confidence in the integrity or fidelity
of another who thereby gains a resulting superiority of influence
over the first, or when one assumes control and responsibility over
another."  Reuben H. Donnelly Corp. v. Mark I Mktg. Corp., 893 F.
Supp. 285, 289 (S.D.N.Y. 1995); accord DDCLAB, 2005 WL 425495, at
*8; Ross v. FSG PrivatAir, Inc., No. 03 Civ. 7292(NRB), 2004 WL
1837366, at *5 (S.D.N.Y. Aug. 17, 2004).  The Committee maintains
that HIG/HVC assumed control of Grumman.

"Control" persons are not limited to the officers and directors
of a corporation.  They include "those persons who exercise de facto
control of the corporation during the relevant times."  Banco de

24

Desarrollo Agropecuario, S.A. v. Gibbs, 709 F. Supp. 1302, 1306
(S.D.N.Y. 1989).  To prove control, "courts require a strong showing
that the creditor assumed actual, participatory, total control of
the debtor.  Merely taking an active part in the management of the
debtor corporation does not automatically constitute control . . .
."  Nat'l Westminister Bank USA v. Century Healthcare, 885 F. Supp.
601, 603 (S.D.N.Y. 1995) (quoting Krivo Industrial Supply Co. v.
Nat'l Distillers & Chemical Corp., 483 F.2d 1098, 1105 (5th Cir.
1973)).

       Bankruptcy law recognizes a similar concept.  Under section
101(31)(B) of the Bankruptcy Code, an "insider" of a corporation
includes a "person in control."  The Bankruptcy Code does not define
"person in control," and the determination must be made in light of
the facts and circumstances on a case-by-case basis.  Pan Am Corp.
v. Delta Air Lines, 175 B.R. 438, 499 (S.D.N.Y. 1994); Official
Committee of Unsecured Creditors v. Austin Fin. Servs., Inc. (In re
KDI Holdings, Inc.), 277 B.R. 493, 511 (Bankr. S.D.N.Y. 1999); CPY
Co. v. Ameriscribe Corp. (In re Chas. P. Young Co.), 145 B.R. 131,
136 (Bankr. S.D.N.Y. 1992).

       Generally, one who controls the debtor's day-to-day financial,
personnel and business operations is a "person in control."  See
Liberty Mut. Ins. Co. v. Leroy Holding Co. (In re Fort Ann Express,

25

<u>Inc.</u>), 226 B.R. 746, 755-56 (N.D.N.Y. 1998)(entity that directed and managed the debtor's financial affairs, determined which creditors would be paid and in what amounts, determined the location of the debtor's business operations and established administrative procedures was a "person in control" of the debtor); <u>KDI</u>, 277 B.R. at 512 (the relevant factors include control over the debtor's voting stock, personnel decisions and which creditors get paid); <u>ABC Elec. Servs., Inc. v. Rondout Elec., Inc. (In re ABC Elec. Servs., Inc.</u>), 190 B.R. 672, 675 (Bankr. D. Mass. 1995)("Actual management means controlling such things as the debtor's personnel or contract decisions, production schedules, or accounts payable.")(quoting <u>Chas. P. Young</u>, 145 B.R. at 136). Voting control will also suffice. <u>Rubin Bros. Footwear, Inc v. Chemical Bank (In re Rubin Bros. Footwear, Inc.</u>), 73 B.R. 346, 354 (S.D.N.Y. 1987).

The Bankruptcy Code's concern is whether a person is able "to exert influence over a debtor so as to gain a more favorable position." <u>O'Connell v. Shallo (In re Die Fliedermaus, LLC</u>), 323 B.R. 101, 111 (Bankr. S.D.N.Y. 2005); <u>see</u> <u>Clark v. Balcor Real Estate Fin., Inc. (In re Meridith Millard Partners</u>), 145 B.R. 682, 688 (D. Colo. 1992)(the outsider "must be so powerful that the debtor becomes a mere instrument or agent of the creditor, unable to make independent policy and personnel decisions"); <u>Hunter v.</u>

26

Babcock (In re Babcock Dairy Co. of Ohio, Inc.), 70 B.R. 657, 661
(Bankr. N.D. Ohio 1986)(person must have "at least a controlling
interest in the debtor or . . . exercise sufficient authority over
the debtor so as to unqualifiably dictate corporate policy and the
disposition of corporate assets"). However, neither superior
bargaining power nor the contractual right of oversight over the
debtor or its operations transforms an outsider into an insider.
Meridith Millard Partners, 145 B.R. at 688; Babcock Dairy Co., 70
B.R. at 661.


### b.   Does the Claim "Sound in Fraud"

Before examining the sufficiency of the allegations, it is
necessary to consider whether the allegations must satisfy FED. R.
CIV. P. 9(b), which states:

> In all averments of fraud or mistake, the
> circumstances constituting fraud or mistake shall be
> stated with particularity. Malice, intent, knowledge, and
> other condition of mind of a person may be averred
> generally.

Rule 9(b) is designed to provide a defendant with fair notice
of the plaintiff's claim, safeguard the defendant's reputation from
improvident charges of wrongdoing and protect against strike suits.
Campaniello Imports, Ltd. v. Saporiti Italia S.p.A., 117 F.3d 655,
663 (2d Cir. 1997); O'Brien v. Nat'l Property Analysts Partners,
936 F.2d 674, 676 (2d Cir. 1991); DiVittorio v. Equidyne Extractive
Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987); Segal v. Gordon,

467 F.2d 602, 607 (2d Cir. 1972). Although <u>scienter</u> may be pleaded generally, the pleader must nevertheless "allege facts that give rise to a strong inference of fraudulent intent." <u>Shields v. Citytrust Bancorp, Inc.</u>, 25 F.3d 1124, 1128 (2d Cir. 1994); <u>accord</u> <u>Campaniello Imports</u>, 117 F.3d at 663; <u>Chill v. General Elec. Co.</u>, 101 F.3d 263, 267 (2d Cir. 1996). A strong inference of fraudulent intent may be established in one of two ways: "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." <u>Shields</u>, 25 F.3d at 1128; <u>accord</u> <u>Chill v. General Elec. Co.</u>, 101 F.3d at 267.

As a rule, a pleader cannot allege fraud based upon information and belief unless the facts are "peculiarly within the opposing party's knowledge." <u>Schlick v. Penn-Dixie Cement Corp.</u>, 507 F.2d 374, 379 (2d Cir. 1974), <u>cert. denied</u>, 421 U.S. 976 (1975); <u>accord</u> <u>Campaniello Imports</u>, 117 F.3d at 664. Even in those cases, the pleader must allege facts upon which the belief is founded. <u>Campaniello Imports</u>, 117 F.3d at 664; <u>Schlick</u>, 507 F.2d at 379; <u>Segal</u>, 467 F.2d at 608. Since a bankruptcy trustee rarely has personal knowledge of the events preceding his appointment, he can plead fraud upon information and belief, provided that he pleads "specific facts supporting an inference of knowledgeable

28

participation in the alleged fraud."   See Devaney v. Chester, 813
F.2d 566, 569 (2d Cir. 1987); accord Nisselson v. Drew Indus., Inc.
(In re White Metal Rolling & Stamp Corp.), 222 B.R. 417, 428
(Bankr. S.D.N.Y. 1998).

Fraud, per se, is not an element of a claim for breach of
fiduciary duty.  Nevertheless, the allegations must satisfy FED. R.
CIV. P. 9(b) if the claim is based on fraudulent conduct.   Krause
v. Forex Exchange Mkt., Inc., 356 F. Supp. 2d 332, 338 n.49
(S.D.N.Y. 2005); see Rombach v. Chang, 355 F.3d 164, 171 (2d Cir.
2004) ("Rule 9(b) applies to "all averments of fraud" . . . . This
wording is cast in terms of conduct alleged, and is not limited to
allegations styled or denominated as fraud or expressed in terms of
the constituent elements of a fraud cause of action.")

According to HIG/HVC, the Eighth Cause of Action is based on
fraudulent conduct and is subject to Rule 9(b).  Generally, a non-
fraud claim will "sound in fraud" if the claim arose out of events
that the pleading describes in terms of fraud or the pleading
includes a claim based on fraud, and the non-fraud claim
incorporates the fraud allegations.  For example, in Rombach, the
plaintiffs brought a class action alleging that they had purchased
shares in a corporation after the defendants issued optimistic
public statements that turned out to be inaccurate or untrue.  355

29

F.3d at 167-68.   The complaint contained five claims, including violations of §§ 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act") as well as § 10(b) of the Exchange Act of 1934 and Rule 10b-5.   355 F.3d at 168.   The district court dismissed the complaint, <u>inter alia</u>, based on the failure to plead the claims with particularity, <u>id.</u> at 170, prompting the appeal.

Without doubt, Rule 9(b) governed the requirements for pleading the claims under the Exchange Act of 1934 and Rule 10b-5. <u>See id.</u> at 170.   The principal issue before the Court of Appeals was whether Rule 9(b) also applied to the Securities Act claims. Initially, the Court of Appeals ruled that although fraud is not an element of claims under §§ 11 and 12(a)(2) of the Securities Act, the pleader must comply with Rule 9(b) if the claims "rely upon averments of fraud."   <u>Id.</u> at 171.

The Court then proceeded to examine the allegations in the pleading, and concluded that the non-fraud claims sounded in fraud. The complaint described the relevant statements as "misleading," "inaccurate, "untrue" and "false," and "the wording and imputations of the complaint are classically associated with fraud."   <u>Id.</u> at 172; <u>accord</u> <u>Melder v. Morris</u>, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994)(non-fraud claim sounded in fraud in light of "wholesale adoption" of securities fraud allegations from other claims in the

complaint); <u>Shapiro v. UJB Fin. Corp.</u>, 964 F.2d 272, 287 (3d Cir. 1992)(non-fraud claim sounded in fraud where it incorporated earlier allegations that delineated the defendants' intent, described statements as "false and misleading," and averred that the defendant "intentionally," "knowingly," or "recklessly" misrepresented or omitted material information); <u>In re Natural Gas Commodity Litig.</u>, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005)(non-fraud claim sounded in fraud where complaint alleged a scheme through which the defendants disseminated "inaccurate, misleading, and false trading information," and participated in "fraudulent trading strategies"); <u>Krause</u>, 356 F. Supp. 2d at 338 n.49 (Rule 9(b) applied to breach of fiduciary duty claim that incorporated all of the plaintiffs' fraud allegations and added that the defendants "fraudulently" caused the plaintiff to enter into the transactions described in the complaint); <u>In re Ultrafem Inc. Sec. Litig.</u>, 91 F. Supp. 2d 678, 690-91 (S.D.N.Y. 2000)(non-fraud claim sounded in fraud where complaint incorporated by reference allegations that the defendant engaged in a continuing scheme to present a distorted and misleading picture of a corporations financial condition, internal controls and business prospects, notwithstanding "boilerplate" disclaimer that allegations sounding in fraud were not incorporated).

Here, the Eighth Cause of Action does not sound in fraud.

None of the claims in the Amended Complaint is based on a misstatement. Moreover, the Amended Complaint does not contain the usual "buzz" words "classically associated with fraud." It does not characterize anything as "inaccurate," "misleading," "untrue," or "false." Finally, the Amended Complaint does not allege that HIG/SVC or McConnell did anything secretly, concealed any information, or failed to disclose a material fact.

The one arguable exception -- the Second Cause of Action – asserts a claim for an intentional fraudulent transfer which must be pleaded with particularity. <u>See</u> <u>Atlanta Shipping Corp. v. Chemical Bank</u>, 818 F.2d 240, 251 (2d Cir. 1987)(intentional fraudulent conveyance claim under N.Y. Debtor & Creditor Law § 276 must plead with particularity); <u>White Metal</u>, 222 B.R. at 429. The Committee alleges that the Private Sale Premium and the post-September 17th salary payments were property of Grumman transferred to McConnell in fraud of creditors. Although the Eighth Cause of Action incorporates these allegations, (¶¶ 67-68), the Amended Complaint does not allege that HIG/SVC was the transferor or the transferee. Furthermore, while these allegations form part of the aiding and abetting claim, (<u>see</u> <u>Amended Complaint</u>, ¶ 96 ("HIG and SVC designed and structured the transaction with McConnell in a manner that resulted in McConnell's breaches of his fiduciary duties")), and the tortious interference claim, (<u>see</u> <u>id.</u>, ¶ 109

32

("[b]y inducing McConnell to enter into the Side Agreements, HIG and SVC intentionally interfered with the McConnell Employment Agreement")), the breach of HIG/SVC's fiduciary claim focuses on HIG/SVC's self-dealing, and not McConnell's.

In short, the breach of fiduciary duty claim against HIG/SVC is not grounded on a fraud theory.  To be sure, the Committee alleges a course of dishonest conduct involving self-dealing, misappropriation, diversion of assets.  But not every claim based on dishonesty necessarily sounds in fraud.  Here, the Amended Complaint brands the defendants as thieves, not liars, and the pleading requirements imposed by FED. R. CIV. P. 9(b) do not apply.  See Rahl v. Bande, No. 04 Civ. 1019 (WCC), 2005 WL 1719787, at *17-18 (S.D.N.Y. July 22, 2005) (Rule 9(b) did not apply to claim that "defendants breached their fiduciary duties by deepening [the debtor's] insolvency to enhance their personal wealth" but did apply to breach of fiduciary duty claim based on issuance of false financial statements); Official Committee of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp., No. 00 Civ. 8688 (WHP), 2002 WL 362794, at *8 (S.D.N.Y. March 6, 2002) (Rule 9(b) did not apply where defendant "may be found to have breached its fiduciary duty . . . by conduct not amounting to fraud, such as by breaching its duties of care, disclosure and loyalty").

33

### c.   The Eighth Cause of Action Satisfies Rule 9(b) and States a Claim for Relief

Even if the Eighth Cause of Action sounded in fraud, the Amended Complaint contains enough specific factual allegations to comply with Rule 9(b) and state a claim for relief.  Although the Amended Complaint does not allege facts establishing that HIG/SVC assumed the day-to-day control over all of Grumman's operations, the averments show that HIG acquired absolute control over the sale process, Grumman's most pressing business.

On September 17, 2002, HIG entered into the Letter of Intent with Grumman and Holdings to buy either the stock or assets of Grumman.  McConnell signed the Letter of Intent in two capacities – on behalf of Holdings and as president and chief executive officer.  As noted earlier, the Letter of Intent restricted Grumman's ability to engage in transactions outside the ordinary course of business without HIG/SVC's written consent.  It also contained a "no shop, no talk" clause.  As a consequence of the latter restriction, Grumman did not pursue any other possible buyers.

SVC simultaneously hired McConnell as a consultant for two years to provide assistance and guidance to SVC's management "with respect to strategic decisions as needed from time to time including in connection with, among other things, the acquisition

34

of [Grumman] currently being undertaken by [SVC]." (<u>Consulting</u> <u>Agreement</u>, § 3.)   HIG/SVC knew that McConnell was Grumman's president and CEO – he signed the Letter of Intent in that capacity.  Notwithstanding, they agreed that McConnell would devote 20 hours each week (during the first 90 days) to SVC, work under the supervision of SVC's board of directors, receive an annual consulting fee of $200,000, or a total of $400,000, plus a possible bonus, receive benefits and perquisites not "otherwise" provided, and keep non-public information relating to the sale process from Grumman.[6]   In addition, the Committee alleges that SVC granted McConnell potentially valuable stock options.

At the same time that HIG/SVC co-opted McConnell, all of Grumman's other board members resigned, leaving McConnell as Grumman's sole director.   In addition, HIG/SVC acquired a call option on the interests of all but two of the members of Holdings and an irrevocable proxy to vote the member interests.  Finally, it directed McConnell to hire A&M as a crisis management firm to represent Grumman in the negotiations with HIG/SVC.

_____

[6]     McConnell also agreed that he would "not serve as or be a consultant to or employee, officer, agent, director or owner of more than five percent (5%) of another corporation, partnership or other entity in competition with the Corporation in the Business." (<u>Consulting Agreement</u>, § 8(b).)  The "Business" referred to "the manufacture, distribution and sales of refrigerated, beverage, and emergency rescue vehicle truck bodies and refrigerated beverage and emergency rescue vehicle truck body parts and related equipment." (<u>Id.</u>, 1st WHEREAS clause, at p. 1.)  The Consulting Agreement arguably prevented McConnell from continuing to work for Grumman.

The Amended Complaint paints a picture of Grumman as a vassal of HIG/SVC. Citing McConnell's deposition testimony, it alleges that after the Side Agreements and the Voting Proxy, Grumman's continuing operations were set aside, and HIG controlled Grumman and called the shots. The Amended Complaint therefore contains sufficient specific allegations to the effect that on and after September 17, 2002, HIG/SVC controlled Grumman to a degree that it became an insider subject to the same fiduciary duties that the de jure officers and directors owed to Grumman, and in light of Grumman's insolvency, to its creditors.

The Amended Complaint also includes sufficient allegations of breach and damage. It alleges, or at least implies, that once HIG/SVC became an insider, it breached its duty of loyalty, and prevented Grumman from marketing its assets and maximizing their value.[7] The breach delayed the eventual sale of Grumman's assets to a third party, and as a result of the delay, the value of those assets dropped by $6 million. (See Amended Complaint, ¶ 58.)

This conclusion also disposes of HIG/SVC's last contention. They argue that the Amended Complaint fails to properly plead damages because the allegations are speculative, conclusory and

---

[7] For example, HIG/SVC could have – and under the Committee's theory, should have – waived the "no shop/no talk" provision in the Letter of Intent and directed McConnell to contact other potential buyers.

imaginary.  This largely confuses the pleading of damages with the proof of damages.  The plaintiff is not "obliged to show, at this stage of the pleadings, that [it] actually sustained damages . . . . [It need only plead] allegations from which damages attributable to the [defendant's conduct] might be reasonably inferred."  Tenzer, Greenblatt, Fallon & Kaplan v. Ellenberg, 604 N.Y.S.2d 947, 948 (N.Y. App. Div. 1993).  As noted, the Amended Complaint includes a allegation of damage ($6 million) proximately caused by "McConnell's and HIG/SVC's self-dealing and breaches of their fiduciary duties of loyalty and care."  Accordingly, the Eighth Cause of Action will not be dismissed.

**B.   McConnell's Motion to Dismiss for Improper Venue**

   **1.   Introduction**

   McConnell has separately moved to dismiss for improper venue, or alternatively, to transfer the proceeding to the Western District of Michigan, Kalamazoo Division.  The first part of his motion argues that the fraudulent transfer claims alleged in the Second, Third and Fourth Causes of Action arose post-petition from the operation of Grumman's business.  They had to be brought in Kalamazoo rather than New York, and should be dismissed.  Furthermore, these improperly venued claims doom the entire adversary proceeding which must also be dismissed.

37

### 2.   The Relevant Statutes

Three venue statutes figure into McConnell's argument. Section 1409 of title 28 governs the venue of proceedings in bankruptcy cases.  It states in pertinent part:

> (a) Except as otherwise provided in subsections (b) and (d), a proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending.
>
> * * * *
>
> (d) A trustee may commence a proceeding arising under title 11 or arising in or related to a case under title 11 based on a claim arising after the commencement of such case from the operation of the business of the debtor only in the district court for the district where a State or Federal court sits in which, under applicable nonbankruptcy venue provisions, an action on such claim may have been brought.

Subsection (a) establishes the general rule that the trustee may place a bankruptcy proceeding, whether core or non-core, where the bankruptcy case is pending, _i.e._, in the "home" court. Subsection (d) creates an exception.  If the proceeding relates to a post-petition claim that arose from the operation of the debtor's business, the non-bankruptcy venue provisions govern.

The general provisions that regulate federal court venue appear in 28 U.S.C. § 1391.  Subsection (b), the relevant provision, states:

> (b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a

38

judicial district where any defendant resides, if all
defendants reside in the same State, (2) a judicial
district in which a substantial part of the events or
omissions giving rise to the claim occurred, or a
substantial part of property that is the subject of the
action is situated, or (3) a judicial district in which
any defendant may be found, if there is no district in
which the action may otherwise be brought.

Finally, 28 U.S.C. § 1406(a) controls the disposition of
improperly venued proceedings, offering two alternatives: dismiss
or transfer:

> The district court of a district in which is filed
> a case laying venue in the wrong division or district
> shall dismiss, or if it be in the interest of justice,
> transfer such case to any district or division in which
> it could have been brought.

The fraudulent transfer claims focus on the Private Sale
Premium and the post-September 17th salary payments.  McConnell
maintains that they mainly involve post-petition transfers.  Under
28 U.S.C. 1391(b)(2), the applicable subparagraph, these claims had
to be brought in the Western District of Michigan, Kalamazoo
Division.  The Committee argues that the fraudulent transfer claims
arose pre-petition and did not arise out of Grumman's operations.

c.  **Discussion**

On a motion to dismiss based on improper venue, the plaintiff
has the burden of showing that its choice of venue was a proper
one.  McKeown v. Port Auth. of N.Y. & N.J., 162 F. Supp. 2d 173,
183 (S.D.N.Y.), aff'd without op. sub nom., McKeown v. Delaware

Bridge Auth., 23 Fed. Appx. 81 (2d Cir. 2001), cert. denied, 535
U.S. 1079 (2002).   The court must accept the allegations in the
complaint as true, unless contradicted by affidavits.   Solow Bldg.
Co., LLC v. ATC Assocs., Inc., 175 F. Supp. 2d 465, 469 (E.D.N.Y.
2001); McKeown, 162 F. Supp. 2d at 183 (S.D.N.Y.).   If the
allegations in the complaint are challenged, the court may examine
the facts outside the complaint to determine if venue is proper.
McKeown, 162 F. Supp. 2d at 183.   "The court must draw all
reasonable inferences and resolve all factual conflicts in favor of
the plaintiff."   Id. at 183 (internal quotation marks and citation
omitted).

When multiple claims are joined in a single action, the
plaintiff must establish that venue is proper for each cause of
action.   Hsin Ten Enter. USA, Inc. v. Clark Enters, 138 F. Supp. 2d
449, 462 (S.D.N.Y. 2000); 17 James Wm. Moore, Moore's Federal Practice §
110.05, at 110-46.1 (3d ed. 2005).   This can impede the disposition
of multi-count complaints, and the courts in this Circuit have
dealt with this problem through the principle of pendent venue.
Under this approach, a court faced with two federal claims subject
to different venue rules must identify the primary claim and apply
the venue statute applicable to that claim.   Hsin Ten Enter. USA,
138 F. Supp. 2d at 462-63 (quoting Garrel v. NYLCare Health Plans,
Inc., No. 98 Civ 9077, 1999 WL 459925, at *5 (S.D.N.Y. June 29,

40

1999)); accord Solow Bldg. Co., 175 F. Supp. 2d at 469-70.

Although Committee did not invoke the doctrine of pendent venue by name, it relied on its rationale. The Committee argued that the other claims against McConnell arose pre-petition, those claims "predominate," and venue is therefore proper in this Court under 28 U.S.C. § 1409(a). (Memorandum in Opposition to Defendant James McConnell's Motion to Dismiss, dated May 16, 2005, at 14 (ECF Doc. # 39) I agree, and conclude that under the doctrine of pendent venue, the Court may retain the fraudulent transfer claims.[8]

All of the claims alleged in the Amended Complaint arose out of the same nucleus of facts: (1) HIG/SVC bribed McConnell by paying him – rather than Grumman – the Private Sale Premium; (2) in exchange, McConnell ceded control over the sale process to HIG/SVC; and (3) had McConnell done his duty, and shopped Grumman's assets to other potential buyers, Grumman could have sold those assets for an additional $6 million. McConnell does not contest the appropriateness of venue over the non-fraudulent transfer claims, including two other bankruptcy claims (preference and turnover) or four common law claims sounding in breach of fiduciary duty, breach

---

[8]     This assumes that all or a substantial part of the fraudulent transfer claims arose post-petition.  I do not decide this question.

of contract, theft of corporate opportunity and unjust enrichment. These claims are rooted in Grumman's pre-bankruptcy past, and venue is proper under 28 U.S.C. § 1409(a).

Instead, McConnell ignores the common law claims and seizes on the fraudulent transfer claims to support his venue motion. But the common law claims, particularly the pre-bankruptcy breaches of fiduciary duty and contract, are the primary claims against McConnell. The fraudulent transfer claims seek to recover a relatively small part of the overall damages based on what McConnell received rather than what Grumman lost. The breach of fiduciary duty and breach of contract claims, however, permit the estate to recoup the $6 million loss caused by the delay in the sale of Grumman's assets.

The common law claims also permit the estate to recover the value of the fraudulently conveyed property. For example, the post-September 17th salary payments may be recoverable, either as a breach of contract or fiduciary duty, under New York's "faithless servant" doctrine.[9]   See Phansalkar v. Andersen Weinroth & Co., L.P., 344 F.3d 184, 200 (2d Cir. 2003)(a principal is generally

---

[9]      I have assumed without deciding that New York's "faithless servant" doctrine would apply because Grumman is a New York corporation. In any event, Michigan, where Grumman maintained its principal place of business, follows a similar rule. See Sweeney & Moore, Inc. v. Chapman, 294 N.W. 711, 712-13 (Mich. 1940).

entitled to recover compensation paid to a faithless agent). Similarly, the Private Sale Premium may be recoverable on the theory that McConnell stole a corporate opportunity, or breached his fiduciary or contractual duties to Grumman.

Since the common law claims are the primary claims and are properly venued, the Court may adjudicate the fraudulent transfer claims as well. Accordingly, the portion of McConnell's motion to dismiss based on improper venue is denied.

## C.   McConnell's Alternative Motion to Transfer Venue

### 1.   Introduction

Assuming proper venue, McConnell requests a change of venue under 28 U.S.C. § 1404(a)[10] based on the interest of justice and convenience of the parties and the witnesses. Since, however, venue is proper under 28 U.S.C. § 1409(a), the request to change venue must be based on 28 U.S.C. § 1412, which states:

> A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.

---

[10]     Section 1404(a) states:

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

The decision to change venue lies within the sound discretion of the court and is based on "an individualized, case-by-case consideration of convenience and fairness." In re Manville Forest Prods. Corp., 896 F.2d 1384, 1391 (2d Cir. 1990) (quoting Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988)).  Section 1412 permits – but does not require –  a court to transfer a properly venued proceeding "in the interest of justice or for the convenience of the parties."  The party seeking to change venue bears the burden of proof by a preponderance of the evidence. Manville, 896 F.2d at 1390.  The district in which the underlying case is pending is presumed to be the appropriate district to hear and determine the proceeding.  Id. at 1391.

Since the § 1412 criteria are stated in the disjunctive, they are considered separately.

### 2.    Convenience of the Parties

"Convenience" generally involves consideration of the location of the parties and their counsel, the location of the proof, and the ability to compel otherwise unwilling witnesses to testify.  Unlike § 1404(a), the convenience of the witnesses does not have to be considered under § 1412.  1 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 4.04[4][a], at 4-31 to 4-32 (15th ed. rev. 2005)("COLLIER").  The Committee finds this a convenient venue,

44

and HIG/SVC seems content, so McConnell must mean that he finds Manhattan personally inconvenient.

To quote District Judge Kent in <u>Carlile v. Continental Airlines, Inc.</u>, 953 F. Supp. 169 (S.D. Tex. 1997), McConnell's argument leaves me "amused to the point of befuddlement." <u>Id.</u> at 171. In that case, the defendant moved to change venue in a sex discrimination case under 28 U.S.C. § 1404(a). In denying the motion, the court observed that the defendant had filed a major antitrust case in the same forum, and concluded:

> The Court is not persuaded that the Galveston Division, which was a convenient forum for Continental to litigate the fate of its very corporate life and where hundreds of millions of dollars were at stake, is not a convenient forum in which to defend itself against a single plaintiff's discrimination claims just four years later.

<u>Id.</u>

McConnell's argument has a similar ring. By the time Grumman filed its petition, McConnell was the only remaining officer and director. McConnell could have filed Grumman's bankruptcy case in the Western District of Michigan where Grumman maintained its principal place of business. <u>See</u> 28 U.S.C. § 1408(1).[11] He chose

---

[11]   Section 1408 states in relevant part:

   [A] case under title 11 may be commenced in the district court for the

45

instead to file the case in this Court, basing venue on Grumman's incorporation under New York law.  His preference for Manhattan over Kalamazoo implied that New York was a convenient forum in which the future of Grumman would ultimately be determined.  That said, McConnell has not offered any explanation why Kalamazoo is now more convenient than Manhattan, and he has failed to overcome the very presumption he created by picking a New York venue.

Furthermore, although § 1412 does not expressly require the Court to consider the convenience of the witnesses, McConnell has failed to demonstrate that their convenience weighs in favor of a transfer, or that he will not be able to procure material testimony or other proof absent a transfer.  "When assessing the convenience of witnesses, a court does not merely tally the number of witnesses who reside in the current forum in comparison to the number located in the proposed transferee forum.  Instead, the court must qualitatively evaluate the materiality of the testimony that the

---

district - (1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district . . . .

witnesses may provide." <u>Herbert Ltd. P'ship v. Electronic Arts, Inc.</u>, 325 F. Supp. 2d 282, 286 (S.D.N.Y. 2004). At a minimum, the defendant must submit a list of likely witnesses who would be inconvenienced by retaining the case in the chosen venue, together with a general statement of what each witness would say. <u>Id.</u>; <u>Pilates, Inc. v. Pilates Inst., Inc.</u>, 891 F. Supp. 175, 183 (S.D.N.Y. 1995). In addition, the movant must offer proof that the witnesses will not appear willingly in the chosen forum. <u>Herbert Ltd. P'ship</u>, 325 F. Supp. 2d at 286.

McConnell's memorandum of law identified four likely witnesses, each residing within the 100-mile reach of a Kalamazoo <u>subpoena</u>: Thomas Beard, Thomas Murphy, Michael Bellovich and David Paritz.[12]  (<u>Brief in Support of Defendant James A. McConnell's Motion to Dismiss Amended Adversary Proceeding Complaint</u>, dated May 2, 2005 ("<u>McConnell Brief</u>"), at 14-15)(ECF Doc. # 33).)  The four were either officers of or advisors to Grumman, (<u>see Affidavit [sic] of James A. McConnell</u>, dated May 2, 2005 ("<u>McConnell Affidavit</u>"), at ¶¶ 13-19)(ECF Doc. # 32)), and "have knowledge about the pre- and post-petition operations of the business and the

---

[12]    McConnell also identified three former members of senior management who live beyond the <u>subpoena</u> power of the Kalamazoo court. He pointed out that each would have to travel farther to testify in Manhattan than in Kalamazoo. No evidence was offered to show that they would be unwilling to testify in New York, but would be willing to testify in Kalamazoo. If they would not be willing to testify in either place, their relative proximity to two different courthouses is irrelevant.

47

actions McConnell took that are at issue in this case . . . ."
(McConnell Brief, at 15.)  McConnell failed, however, to explain
what the four would say, or show that they would refuse to come to
New York to testify.[13]  Accordingly, he failed to show that any
witness-related considerations support a transfer.

Moreover, McConnell has not shown that Kalamazoo is more
convenient to the other parties, HIG and SVC.  HIG and SVC maintain
their principal places of business, respectively, in Florida and
North Carolina, and both are represented by the same Miami counsel.
McConnell suggests that Miami "is approximately 1,400 miles from
Kalamazoo and Manhattan," (id., at 14), implying that both locales
are equally convenient.  Counting air miles, important to frequent
flyers, is a poor test of convenience, particularly since planes
don't always fly as the crow does.  But accepting McConnell's
geographical analysis, I still remain unconvinced that Kalamazoo is
more convenient than New York to those who must travel from Miami;
at the least, McConnell has failed to show it.  Furthermore,
neither HIG nor SVC (nor their Miami counsel) has expressed a

---

[13]    The same conclusion applies to the dispute over the location of important
documents and records.  McConnell stated that upon information and belief, "the books and
records of Grumman are located at its Sturgis, Michigan office."  (McConnell Affidavit, ¶ 10.)
Counsel to the Committee responded, also upon information and belief, that a significant portion
of the Committee's documentary evidence is in New York, and the rest of the books and records
are enroute.  (Affirmation of Mark T. Power in Opposition to Defendant James A. McConnell's
Motion to Dismiss, dated May 16, 2005, at ¶ 2.)  Neither statement is probative, but McConnell
has the burden of proof.

48

preference for trying this case in Kalamazoo, nor suggested that Kalamazoo would provide a more convenient forum. Accordingly, I conclude that McConnell has failed to carry his burden of proving that Kalamazoo is more convenient than New York to the parties, or to the extent relevant, to the witnesses.

### 3. Interest of Justice

The "interest of justice" requires a "broad and flexible standard which must be applied on a case-by-case basis." Manville, 896 F.2d at 1391. "It contemplates a consideration of whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness." Id.; accord In re Enron Corp., 317 B.R. 629, 640 (Bankr. S.D.N.Y. 2004). See generally 1 COLLIER ¶ 4.04[4][b], at 4-34 to 4-35. McConnell makes three points in support of a transfer. First, the fraudulent transfer claims must be transferred to Kalamazoo under 28 U.S.C. § 1406(a), and retaining the balance of the claims in New York would result in multiple litigations in different fora.[14] (McConnell Brief, at 16.) Second, most of the claims are non-core, and McConnell will not consent to this Court hearing and determining those claims. (Id., at 20.) Third, McConnell is

---

[14]    Four pages earlier in his brief, McConnell argued that "because 28 U.S.C. § 1406(a) does not contemplate dismissal of only a portion of the case, this entire adversary proceeding should be dismissed." (McConnell Brief, at 12.)

entitled to a jury trial on every count, this Court cannot conduct a jury trial without his consent, and he will not consent. (<u>Id.</u>, at 20-23.)

McConnell's first point is moot. Venue is properly placed in this Court, and the entire adversary proceeding will remain here. Hence, judicial economy will best be served by keeping all of the claims in this Court.

McConnell's second and third points confuse the principles of venue with the allocation of power between the bankruptcy and district courts in the same district. If this Court cannot hear and determine the non-core claims or conduct a jury trial, McConnell's remedy is to move in the United States District Court for the Southern District of New York to withdraw the reference. The allocation of power does not provide a basis to send the case to Kalamazoo.

Moreover, McConnell would face the same problem if the case was transferred. Under Rule 83.2 of the Local Rules of the United States District Court for the Western District of Michigan, all bankruptcy cases and all proceedings arising in, arising under or related to a case under title 11 are automatically referred to the bankruptcy judges in the district. <u>See</u> W.D. MICH. LOCAL R. 83.2(a),

available at   www.miwd.uscourts   .gov/RULES_opinions.htm.   Upon
receipt by the transferee court, the case would automatically be
referred to the bankruptcy court.   McConnell would then have to
make the same motion to withdraw the reference in Kalamazoo
district court.   Thus, McConnell has also failed to show that
transferring this adversary proceeding to Kalamazoo will promote
the interest of justice.

## CONCLUSION

HIG/SVC's motion to dismiss is granted to the extent of
dismissing the Ninth and Eleventh Causes of Action, and is
otherwise denied.   McConnell's motion to dismiss based on improper
venue, or alternatively, to transfer venue to the Western District
of Michigan, Kalamazoo Division, is denied in its entirety.   The
parties are directed to settle separate orders reflecting the
disposition of each party's motion.   They are also directed to
contact chambers to schedule a pre-trial conference.


Dated:     New York, New York
           August 25, 2005



              /s/  *Stuart M. Bernstein*
                STUART M. BERNSTEIN
              Chief United States Bankruptcy Judge